## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VALMONT STRUCTURES, INC.,                )
                                         )
                Plaintiff,               )
                                         )       **C. A. No.**
        vs.                              )
                                         )       **JURY TRIAL DEMANDED**
DAVID T. SPEIER, an individual and S-    )
WINDUP, INC., f/k/a SIGMA INDUSTRIES,    )
INC., a Maryland corporation,            )
                                         )
                Defendant.               )

## COMPLAINT

Valmont Structures, Inc ("Valmont"), through its undersigned attorneys, for its Complaint against David T. Speier ("Speier") and S-Windup Inc., f/k/a Sigma Industries, Inc. ("Sigma") (collectively "Defendants" or "Seller"), states and alleges as follows:

### INTRODUCTION

1.      This action presents a claim for fraud and for indemnification arising from the parties' July 30, 2004 Asset Purchase Agreement.

### PARTIES

2.      Valmont is a Delaware corporation with its principal place of business in Valley, Nebraska.

3.      Speier is an individual who is a resident of Maryland, having an address of 11917 Cedar Creek Road, Bishopville, Maryland 21813.   At all relevant times, Speier was a 95% shareholder in Sigma which is qualified to do business in Delaware.

4.      Sigma is a Maryland corporation with its principal place of business currently located at 11 Cedar Creek Road, P.O. Box 296, Showell, Maryland 21862. Sigma Realty, Inc., a company owned and operated by Speier, owns and leases property known as Lots Seven (7), Eight (8), Twenty-two (22), Twenty-three (23) Twenty-four (24), and Twenty-five (25), of

Selbyville Industrial Park, Selbyville, Sussex, County, Delaware (hereinafter "Selbyville"). Prior to the July 30, 2004 Asset Purchase Agreement, Speier operated and controlled the business activities of Sigma and Sigma Realty, Inc. from the Selbyville location.

## JURISDICTION

5.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 as it is a civil matter between citizens of different states and the amount in controversy, exclusive of interest and costs, presently exceeds the sum of $2 million. This Court may exercise personal jurisdiction over Speier and Sigma pursuant to Title 10, Section 3104 of the Delaware Code as Defendants each have a legal presence within the State of Delaware as a result of one or more acts as enumerated in Section 3104(c), which acts give rise to Valmont's causes of action.

## VENUE

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391, as it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## BACKGROUND FACTS

### The Asset Purchase Agreement

7.    On July 30, 2004, the parties hereto entered into an Asset Purchase Agreement ("Agreement") pursuant to which Valmont purchased certain assets of Sigma and assumed certain specifically identified contract-based liabilities. A copy of the Agreement (minus Exhibits) is attached hereto as Exhibit A and incorporated herein by reference.

8.    The Asset Purchase Agreement specifically provided that Valmont did not assume any liability or obligation for "any breach by [Defendants] of any lease, contract or other agreement to which Seller is a party, whether or not such agreements are assumed by Buyer hereunder" (¶3.1.3.); and/or "product rework, product replacements, allowances, warranties, (whether express or implied) and refunds for damaged, defective or returned product in respect of services provided by [Defendants] on or prior to the Closing Date [July 30, 2004.]" (¶3.1.5)

-2-

9.    As reflected in paragraph 8 of the Asset Purchase Agreement, in order to induce Valmont to purchase the assets, Defendants made numerous representations and warranties to Valmont including those contained at paragraphs 8.7, 8.11, 8.16, 8.22 and 8.27 which provide as follows:

8.7    **Absence of Undisclosed Liabilities**.  Except as set forth in Section 8.7 of the Disclosure Schedule, the Financial Statements as of December 31, 2003 do, and the Closing Balance Sheet will, make full and adequate provision for or disclosure of all obligations, liabilities or commitments (fixed and contingent) of the Seller which are required to be disclosed or reserved for in accordance with generally accepted accounting principles, applied on a basis consistent with the Seller's prior accounting practices and, as of December 31, 2003, the Seller had no obligations, liabilities or commitments (fixed or contingent) which were required to be reserved against in the Financial Statements or disclosed in the notes thereto in accordance with generally accepted accounting principles, applied on a basis consistent with Seller's prior accounting practices.

* * *

8.11    **Licenses, Permits and Orders**.  Exhibit 1.8 contains a true, complete and correct list of all qualifications, registrations, filings, approvals, authorizations, consents, licenses, orders and other permits of all governmental agencies, whether federal, state, or local, owned, held or utilized by Seller (collectively, "Licenses and Permits"). All such Licenses and Permits constitute the only approvals, authorizations, consents, licenses, orders and permits which Seller is required to own, hold or utilize in order to own, operate and lease its properties and carry on the Business as now being conducted and Seller is not presently in violation of any thereof.  All such Licenses and Permits are in full force and effect and no suspension or cancellation of any of them is pending or, to Seller's or the Shareholders' knowledge, threatened, and no basis for suspension or cancellation exists.  Seller will cooperate with Buyer with respect to Buyer's acquisition or assumption of all such Licenses and Permits and securing the transfer of all such Licenses and Permits to Buyer.

* * *

8.16   **Litigation**.   Section 8.16 of the Disclosure Schedule contains a true, complete and correct list and caption of each pending lawsuit, claim, administrative proceeding, arbitration, labor dispute or governmental investigation or inspection to which Seller is a party or which involve or affect the Business or the operations or assets of Seller. With respect to each such proceeding, Section 8.16 of the Disclosure Schedule discloses the name of the counsel for each party, location of the proceeding, a description of the nature of such proceeding and its current status. To the knowledge of Seller and the Shareholders, there are no claims, legal actions or governmental investigations threatened against Seller. Section 8.16 of the Disclosure Schedule further describes all material (individually or in the aggregate) product liability claims received by Seller during the past five (5) years. Neither Seller nor any of its officers, directors, or key employees have been permanently or temporarily enjoined or barred by order, judgment or decree of any court or other tribunal or any agency or self-regulatory body from engaging in or continuing any conduct or practice in connection with the business engaged in by Seller. There is no continuing order, judgment or decree of any federal, state or local court, arbitrator or other tribunal or any governmental or administrative agency or self-regulatory body enjoining Seller from taking or requiring it to take any action of any kind or to which Seller or the Business, operations or assets are subject to or by which it is or may be bound. Seller is not in default under any order, writ, injunction or decree of any federal, state or local court. Neither Seller nor the Shareholders have any knowledge of any state of facts or contemplated event which may give rise to any claim, action, suit, proceeding, complaint, investigation or inspection which could materially adversely affect Seller's Business, operations or assets.

* * *

8.22   **Compliance with Laws**.   Seller has owned and operated, and currently owns and operates, its properties and assets, procured, processed, stored and sold its services, and otherwise carried on and conducted its business in compliance with all federal, foreign, state and local laws, ordinances, rules and regulations. Section 8.22 of the Disclosure Schedule sets forth the past five (5) years all investigations, inspections or citations under any health, environmental, safety or other applicable laws and regulations and under any other federal, state or local laws

or regulations and the results thereof together with a description of all corrective or other action taken with respect thereto. Except as set forth in <u>Section 8.22</u> of the Disclosure Schedule, there are no pending governmental investigations, inspections or citations. The Assets and all assets subject to leases described in <u>Exhibit 1.7</u> are being used and occupied, and are located and constructed, in compliance with, and conform to all applicable federal, state and local laws, rules, regulations and ordinances.

\* \* \*

8.27    **Disclosure and Reliance**. Seller and the Shareholders have disclosed to Buyer all facts material to the transactions contemplated in this Agreement. None of the information, documents, certificates or instruments furnished or to be furnished by Seller or the Shareholders or any of their representatives to Buyer or any of its representatives in connection with this Agreement or otherwise in connection with the transactions contemplated thereby or hereby are false or misleading in any material respect or contain any material misstatement of fact or omit to state any material facts required to be stated to make the statements therein not misleading. The representations and warranties made herein are made by Seller and the Shareholders with the knowledge and expectation that Buyer is placing reliance thereon. To the extent that any portion of the representations and warranties made herein were made to Seller's or the Shareholders' knowledge, Seller and the Shareholders represent that they made due and reasonable inquiry with respect thereto.

10.    Pursuant to the provisions of Paragraph 10 of the Asset Purchase Agreement,

Defendants agreed to indemnify and hold Valmont harmless against and in respect of:

10.1.1  All debts, liabilities and obligations of Seller of any nature, whether accrued, absolute, contingent, or known or unknown on the date hereof, existing or arising on or resulting from events which occurred or failed to occur on or before the date hereof, to the extent not specifically assumed by Buyer hereunder; [and]

\* \* \*

10.1.3  Any liability, loss, claim damage or deficiency resulting directly or indirectly from any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Seller or either Shareholder under this Agreement, or from

any misrepresentation or omission from any certificate or other instrument furnished or to be furnished to Buyer hereunder; [and]

* * *

10.1.5  All other actions, suits, proceedings, demands, assessments, adjustments, costs and expenses incident to the foregoing, including without limitation, reasonable attorneys' fees and other out-of-pocket expenses.

## The Undisclosed Claims Related to the Breakaway System

11.    Prior to July 30, 2004, Sigma was a structural steel fabricator which manufactured and sold a breakaway support system for post mounted signs ("Breakaway System") located along side streets, highways, interstate systems and other areas vulnerable to vehicular traffic. On information and belief, the Breakaway System was designed with a coupling device which was intended to break away upon impact in order to save lives and reduce property damage costs.

12.    Structural steel fabricators who supply steel products for public projects in the Commonwealth of Pennsylvania must comply with certain administrative regulations which, among other things, require such suppliers to obtain prior approval and acceptance of their products from the Pennsylvania Department of Transportation ("PennDot") before supplying products related to PennDot projects.  PennDot maintains a list of approved suppliers and approved construction materials in a document commonly known as Bulletin 15.

13.    On or about November 2003 and March 2004, it was determined that Sigma Breakaways were utilized on signs on projects involving the Pennsylvania Logo Signing Trust ("Logo Trust").  The Logo Trust further determined that Sigma had not been approved by PennDot to supply breakaway systems and directed that such signs and breakaway systems, which were owned by PennDot, be removed and replaced with approved materials.  Defendants

were aware of and were given notice of such rejections by the Logo Trust well before the closing of the transaction with Valmont.

14.    The claims and rejections by the Logo Trust were not disclosed to Valmont and are in fact contrary to the representations and warranties set forth above.

**The Debarment Proceedings Against Valmont**

15.    On or about October 4, 2005, PennDot made claim against Valmont as a result of materials provided by Sigma on PennDot projects. Specifically, PennDot alleged that Sigma "provided unapproved breakaway support systems for sign post components and/or has provided false documentation in regard thereto. . .". A copy of the October 4, 2005 Notice of PennDot's claim is attached hereto and incorporated herein by reference. In connection with its claim, PennDot initiated debarment proceedings against Valmont which, if successful, would have removed Valmont from Bulletin 15 and effectively enjoined Valmont together with its "affiliates, officers and directors and controlling employees" from participating or supplying materials on state supervised or funded highway construction projects or subcontracts within the Commonwealth of Pennsylvania. The debarment of Valmont and its affiliates, officers, directors and controlling employees by the Commonwealth of Pennsylvania would have caused serious repercussions, including possible debarments to Valmont in other states resulting in enormous financial losses and irreparable damage to its reputation.

16.    In addition to debarment, PennDot sought to hold Valmont liable for all costs and expenses to replace the Sigma Breakaway Systems.

17.    On or about December 14, 2005, Valmont gave notice to Defendants of the PennDot claim and demanded indemnification pursuant to the terms of the indemnity provisions of the Asset Purchase Agreement. Notwithstanding such demand, Defendants refused to accept responsibility for the PennDot claim.

18.    In order to avoid debarment, Valmont entered into a Memorandum of Understanding with PennDot whereby Valmont was required to locate, remove and replace the allegedly unapproved Sigma Breakaway Systems supplied in the Commonwealth of Pennsylvania. Valmont entered into the Memorandum of Understanding in a good faith effort to resolve the PennDot's claim and in order to avoid the irreparable damage that would have resulted to it from debarment. Under the terms of the Asset Purchase Agreement, Valmont had the right to take exclusive control of the defense of the claim and negotiate a compromise or settlement of the claim.

19.    To date, Valmont has incurred over $700,000 in locating, removing and replacing the Sigma Breakaway Systems and anticipates expending in excess of $2,000,000 to complete the project.

20.    By letter dated April 27, 2006, Valmont demanded that Defendants reimburse and indemnify Valmont for the costs and expenses incurred in resolving the PennDot claim, including attorney fees. Notwithstanding the terms of the Asset Purchase Agreement, Defendants have failed and refused to reimburse and/or indemnify Valmont.

### FIRST CAUSE OF ACTION
#### (Breach Of Contract)

21.    Valmont incorporates paragraphs 1 through 20 as if fully set forth herein.

22.    The claim of PennDot against Valmont is a liability and obligation of Defendants which resulted from events which occurred or failed to occur on or before June 30, 2004.

23.    In accordance with the terms of the Asset Purchase Agreement Valmont undertook the defense and in good faith entered into an agreement with PennDot to resolve the claim. In resolving PennDot's claim, Valmont will incur costs and expenses including attorneys fees in an amount presently undetermined but believed to be in excess of $2,000,000.

24.    Pursuant to the terms of the Asset Purchase Agreement, Valmont is entitled to complete indemnification from Defendants.

WHEREFORE, Plaintiff Valmont prays that judgment be granted in its favor in an amount sufficient to reimburse Valmont for all costs, expenses and attorney fees incurred in relation to the PennDot claim, for its costs incurred herein, for attorney fees incurred in pursuing this action, for pre- and post-judgment interest and for such other relief as the Court deems appropriate.

## SECOND CAUSE OF ACTION
### (Fraud)

25.    Valmont incorporates paragraphs 1 through 24 as if fully set forth herein.

26.    Defendants knew at the time of the asset sale there were claims that Breakaway Systems were unapproved by PennDot and had been rejected by the Logo Trust and failed to disclose the same to Valmont.

27.    Defendants acted with scienter in concealing the absence of such claims.

28.    The representations and warranties made by the Defendants within paragraphs 8.7, 8.11, 8.16, 8.22 and 8.27 of the Asset Purchase Agreement were untrue statements of material facts and/or failed to state facts necessary to make the representations and warranties not false and/or misleading.

29.    Valmont relied on the representations and warranties of the Defendants in entering into the Asset Purchase Agreement. Had Valmont known that there were allegations and claims against the Defendants that its Breakaway Systems were not approved in Pennsylvania and had been rejected it would not have consummated the sale.

30.    As a proximate result of Defendants' false and misleading representations and concealment, Valmont was subjected to the claim of PennDot and incurred damages related thereto in an amount presently undetermined but in excess of $2,000,000.

WHEREFORE, Valmont prays that judgment be granted in its favor in an amount of its damages to be proven at trial, for its costs and attorney fees incurred herein, for pre- and post-judgment interest and for such other and further relief as the Court deems appropriate.


OF COUNSEL:

Mark F. Enenbach
McGrath, North, Mullin
  & Kratz, P.C. LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, NE  68102
Ph:  (402) 341-3070
Fax: (402) 341-0216

Dated:  July 28, 2006

_X. Dyl O'Connell_

Lisa A. Schmidt (#3019)
Jeffrey L. Moyer (#3309)
K. Tyler O'Connell (#4514)
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700
(302) 651-7701
  Attorneys for Plaintiff,
  Valmont Structures, Inc.

-10-

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

AGREEMENT, dated this _30th_ day of _JULY_, 2004, by and between **SIGMA INDUSTRIES, INC.**, a ~~Delaware~~ corporation ("Seller"), **DAVID T. SPEIER** ("Speier") and **JOHN J. ASHMAN** (individually, a "Shareholder" and, collectively, the "Shareholders"), and **VALMONT STRUCTURES, INC.**, a Delaware corporation ("Buyer").

### RECITALS:

This Agreement is made with reference to the following facts and circumstances:

(a)     Seller owns certain assets used in connection with the business and operations of manufacturing, marketing and selling sign structures (the "Business").

(b)     Shareholders own all of the issued and outstanding shares of capital stock of Seller.

(c)     Seller desires to sell certain of its assets to Buyer and Buyer desires to purchase such assets from Seller, all on the terms and conditions contained herein.

### AGREEMENT:

In consideration of the foregoing recitals which are incorporated with and are made a part of this Agreement, and in further consideration of the mutual covenants and agreements hereinafter contained, the parties hereto agree, subject to the terms and conditions hereinafter set forth, as follows:

1.     **Sale of Properties and Assets.**  Seller hereby sells, conveys, assigns, transfers and delivers to Buyer, free and clear of all liens, claims and encumbrances, the following described properties and assets (collectively the "Assets"):

1.1     **Cash.**  All cash, cash equivalents, marketable securities and investments owned, held by or held for the benefit of, the Seller ("Cash").

1.2     **Sales, General and Administrative Property.**  All customer lists, software (to the extent that such software can be assigned), sales records, purchase records, and other books and records, all sales and administrative assets and all other sales, general and administrative property owned by Seller.

1.3     **Trade Accounts Receivable.**  All of Seller's trade accounts receivable existing on the date hereof (the "Receivables").

1

1.4 **Inventories.** All of Seller's inventory of raw materials, work-in-progress, finished goods, operating supplies and related material existing as of the date hereof (the "Inventories").

1.5 **Fixed Assets.** All machinery and equipment, vehicles, spare parts, office furniture and supplies, office and computer equipment, miscellaneous tools and related items and all other fixed assets owned or used by Seller, including, but not limited to, those listed on Exhibit 1.5 (the "Fixed Assets").

1.6 **Intellectual Property.** All web-sites, trademarks, trade names, service marks, service names, patents, processes, or registrations or licenses thereof or applications therefor which Seller presently owns or utilizes, including, but not limited to, the name *"Sigma Industries"* and those items listed on Exhibit 1.6.

1.7 **Leases and Contracts.** All of Seller's right, title and interest in and to the leases, contracts, purchase and sales contracts, and other agreements listed on Exhibit 1.7, true and correct copies of which have been delivered to Buyer by Seller. If any such lease, contract or other agreement shall require the consent of any party thereto other than Seller, this Agreement shall not constitute an agreement to assign the same, and such lease, contract or other agreement shall not be assigned to or assumed by Buyer if an actual or attempted assignment thereof would constitute a breach or default thereunder. Seller shall use its best efforts to obtain such consents, to the extent required, of such other parties to such leases, agreements and other contracts. If any such consent cannot be obtained, Seller and Buyer will cooperate in any reasonable arrangement designed to obtain for Buyer all benefits and privileges of the applicable lease, contract or other agreement while protecting Seller from continuing liabilities or obligations thereunder.

1.8 **Licenses, Permits and Orders.** All approvals, authorizations, consents, licenses, orders, registrations and other permits and similar items of all governmental agencies whether federal, state or local, owned, held or utilized by Seller, including, but not limited to, those listed on Exhibit 1.8 as are transferable by their respective terms, or otherwise, to Buyer.

1.9 **Supplies and Similar Items.** All operating supplies, maintenance supplies, maintenance equipment and all similar property owned by Seller whether or not such items have been expensed or fully depreciated or are not now or have not in the past been reflected in Seller's books and records for obsolescence or other reasons.

2. **Excluded Assets.** Buyer shall not purchase any assets other than those described in Section 1 above and shall not purchase or assume any contract or agreement other than those described in Exhibit 1.7. Except as set forth above, and except as otherwise specifically provided herein, it is the intent of the parties hereto that Buyer acquire all other assets of Seller, particularly items which have been heretofore expensed or fully depreciated.

2

3.    **Consideration Payable to Seller by Buyer.** Subject to the terms and conditions of this Agreement, and in consideration of the sale, conveyance, assignment, transfer and delivery by Seller of the Assets pursuant to Section 1 hereof, Buyer agrees as follows:

3.1    **Assumption of Liabilities.** From and after the date hereof, Buyer shall assume and agree to pay, perform and discharge (i) all of the obligations of Seller accruing from and after the Closing Date with respect to the leases and other contracts described in Exhibit 1.7 hereof, (ii) Seller's trade accounts payable listed on Exhibit 3.1(a) (the "Payables"), (iii) the accrued expenses of Seller set forth on Exhibit 3.1(b) (the "Accrued Expenses"), and (iv) the interest bearing debt of Seller set forth on Exhibit 3.1(c) (the "Interest Bearing Debt"). Buyer does not assume and shall not be deemed to have assumed any liability or obligation of Seller not described above, including, but not limited to:

3.1.1    Any liability or obligation of Seller for any taxes of any nature whatsoever other than and only to the extent accrued for on the Closing Balance Sheet;

3.1.2    Any liability or obligation of Seller for any accounts payable or under any loan agreement, lease agreement or any other contract or agreement (except as otherwise specifically provided for herein) including, without limitation, amounts payable in connection with the assignment of the Interest Bearing Debt to Buyer or in connection with Buyer's payment of the Interest Bearing Debt, except as set forth in Section 3.1 above;

3.1.3    Any liability or obligation of Seller arising out of or resulting from any breach by Seller of any lease, contract or other agreement to which Seller is a party, whether or not such agreements are assumed by Buyer hereunder;

3.1.4    Any liability or obligation of Seller arising out of or resulting from any violation by Seller of any federal, state or local laws or regulations including, without limitation, environmental laws and regulations, or from the sale by Seller of any product;

3.1.5    Any liabilities for product rework, product replacements, allowances, warranties (whether express or implied) and refunds for damaged, defective or returned product in respect of services provided by Seller on or prior to the Closing Date;

3.1.6    Any and all workers' compensation (including, without limitation, weekly benefits, medical rehabilitation expenses and any other expenses or obligations) with respect to injuries or illnesses suffered by any Hired Employee (as defined in Section 7) resulting from occurrences on or prior to the Closing Date, whether known or unknown as of the Closing Date;

3.1.7    Any liability for any severance, termination or similar obligations, including, without limitation, obligations under the Workers' Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act"),

resulting from events occurring on or prior to the Closing Date, or resulting from the consummation of the transactions contemplated herein;

3.1.8 Any liability or obligation of Seller not expressly assumed by Buyer hereunder.

3.2 **Purchase Price for the Assets.** Subject to the provisions of Section 4 below, the purchase price for the Assets described in Section 1 (the "Purchase Price") shall be an amount equal to Five Million Dollars ($5,000,000).

3.3 **Payment of Purchase Price.** The Purchase Price shall be paid by Buyer to Seller in immediately available funds on the date hereof.

3.4 **Allocation of Purchase Price.** The parties hereto agree that the Purchase Price shall be allocated to the Assets in accordance with Exhibit 3.4 hereto. The parties hereto acknowledge that such allocation represents the fair market value of the Assets and shall be binding upon the parties hereto for federal and state tax purposes. Each party covenants to report gain or loss or cost basis, as the case may be, in a manner consistent with Exhibit 3.4 for federal and state tax purposes. Upon execution of the Settlement Statement, the parties shall exchange mutually acceptable and completed IRS Forms 8594 which they shall use to report the transaction contemplated under this Agreement to the Internal Revenue Service in accordance with such allocation.

4. **Post-Closing Matters.**

4.1 **Closing Balance Sheet; Statement of Earnings.** As soon as practicable after the Closing Date, Seller and Buyer shall prepare, or cause to be prepared, in accordance with generally accepted accounting principles applied on a basis consistent with the Seller's prior historical accounting practices and preparation of the "Financial Statements" (as defined in Section 8.6 below), a balance sheet of the Seller as of the Closing Date (the "Closing Balance Sheet").

4.2 **Comparison of Shareholder's Equity.** Upon completion of and Seller's and Buyer's acceptance of the Closing Balance Sheet ("Settlement Date"), Seller and Buyer shall compare the shareholder's equity of Seller as reflected on Seller's December 31, 2003 compiled balance sheet, adjusted for excluded assets, ("December Shareholders' Equity") to the shareholder's equity of Seller as reflected on the Closing Balance Sheet, adjusted for excluded assets, ("Closing Balance Sheet Shareholders' Equity"). On the Settlement Date, Buyer shall pay to Seller the amount by which the Closing Balance Sheet Shareholders' Equity exceeds the December Shareholder's Equity or, the Seller shall remit to Buyer the amount by which the December Shareholders' Equity exceeds the Closing Balance Sheet Shareholders' Equity.

4.3 **Repurchase of Receivables.** All Receivables which remain uncollected one hundred fifty (150) days after the Closing Date shall be immediately repurchased by

Seller and/or the Shareholders at the face value of such uncollected Receivables, less the amount of any reserve established on the Closing Balance Sheet.

5.      **Ancillary Agreement.**   At Closing, the parties shall execute, or cause to be executed, the following agreement:

5.1     **Lease.**  Sigma Realty Inc. and Buyer shall execute the Lease Agreement for Seller's facility in Selbyville, Delaware in the form attached hereto as <u>Exhibit 5.1</u> (the "Lease").

6.      **Closing.**   Subject to the terms and conditions contained in this Agreement, the transfer of the Assets by Seller to Buyer (the "Closing") will take place on the date hereof at the offices of McGrath North Mullin & Kratz, PC LLO, Suite 3700, First National Tower, 1601 Dodge Street, Omaha, Nebraska 68102. The actual date on which the Closing occurs is herein referred to as the "Closing Date".

6.1     **Buyer's Obligation at Closing.**  Concurrently with the execution of this Agreement, Buyer shall:

6.1.1   **Payment.**  Pay to Seller, in immediately available funds, the Purchase Price.

6.1.2   **Resolutions.**  Deliver a copy of the resolutions of Buyer's Board of Directors authorizing the transactions contemplated by this Agreement.

6.1.3   **Instruments of Assumption.**   Deliver instruments under which Buyer assumed Seller's obligations described in Section 3.1.

6.1.4   **Lease.**  Execute and deliver the Lease.

6.2     **Seller's and/or the Shareholders' Obligations at Closing.**  Concurrently with the execution of this Agreement, Seller and/or the Shareholders shall:

6.2.1   **Instruments of Conveyance.**  Execute and deliver such assignments, bills of sale, endorsements, notices, consents, assurances and such other instruments of conveyance and transfer as counsel for Buyer shall reasonably request and as shall be effective to vest in Buyer good and marketable title to all of the Assets.  Simultaneously with such delivery, Seller shall take all such steps as may be necessary to put Buyer in actual possession and control of the Assets.  Seller and the Shareholders further agree that they will at any time, and from time to time after the Closing Date, upon the reasonable request of Buyer and without additional consideration, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, assignments, transfers, conveyances, powers of attorney and assurances as may be required in conformity with this Agreement for the better assigning, transferring, granting, conveying, assuring and confirming to Buyer or to its successors and assigns, or for aiding and assisting in collecting and reducing to possession, any or all of the

Assets or other properties sold, conveyed, assigned, transferred and delivered at the Closing to Buyer as provided herein.

6.2.2    **Resolutions.**  Deliver a copy of the resolutions of the Board of Directors and the shareholders of Seller authorizing the transactions contemplated by this Agreement, certified by the Secretary or any Assistant Secretary of Seller.

6.2.3    **Lease.**  Cause Sigma Realty Inc. to execute and deliver the Lease.

6.3    **Change of Corporate Name.**  Within the three (3) day period following the Closing, Seller shall cause to be filed with the Secretary of State of the State of _____, a Certificate of Amendment to its Certificate of Incorporation which shall change its corporate name to some other name which bears no resemblance to its present name and does not use the name *"Sigma Industries"* alone or in conjunction with any other name or words.  Neither Seller nor the Shareholders shall use, or allow any entity under Seller's or the Shareholders' control to use any name which bears any resemblance to *"Sigma Industries"*.

7.    **Employee Matters.**  Seller shall terminate all of its employees as of the Closing Date.  Buyer shall extend offers of employment to such terminated employees of Seller with compensation and benefit packages comparable to those provided by Seller to its employees immediately prior to the date hereof.  Employees accepting such offers of employment are hereinafter called "Hired Employees" and all other employees, shall be called "Seller Employees".  Buyer shall recognize each Hire Employee's service with the Seller for determining eligibility to participate in Buyer's benefit plans offered to the Hired Employees.  In addition, the parties hereby agree as follows:

7.1    **Retirement and 401(k) Plans.**  Except as otherwise agreed to by Buyer, Seller shall remain responsible for all retirement and 401(k) plans maintained by Seller for any of its employees, whether or not hired by Buyer.  It is the intent of the parties to allow Hired Employees the opportunity to roll their 401(k) accounts maintained by Seller into the 401(k) plan maintained for the benefit of Buyer.

7.2    **Medical Insurance.**  Buyer shall not be responsible (and Seller shall be responsible) for any health and accident claims and expenses with respect to occurrences prior to the time that a Hired Employee commences active employment with Buyer and Seller shall not be responsible (and Buyer shall be responsible) for any health and accident claims and expenses with respect to occurrences incurred by a Hired Employee after the time that a Hired Employee commences active employment with Buyer.  For the _5 mths_ _(150)_ day period immediately following the Closing Date, Seller will maintain without change its existing medical plan which shall provide uninterrupted coverage for all Hired Employees.  At the end of this _5 mth_ _(150)_ day period, the Hired Employees will be offered coverage under a medical plan maintained by Buyer.  Buyer shall reimburse Seller for premium-related expenses incurred by Seller until the Hired Employees are covered under Buyer's medical plan.

7.3   **COBRA.** Seller will be responsible for satisfying obligations under Section 601 et seq. of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code"), to provide continuation coverage to, or with respect to, any Hired Employee or Seller Employee in accordance with law with respect to any "qualifying event" occurring on or before the Closing Date or resulting from the transactions contemplated herein.

7.4   **Severance.** Seller shall be responsible for any severance or similar obligations payable to any Hired Employee or Seller Employee including, without limitation, obligations under the WARN Act, resulting from events occurring on or prior to the Closing Date, or resulting from the transactions contemplated herein.

7.5   **Seller Employees.** Buyer shall have no obligation or liability with respect to any Seller Employee and Seller shall be responsible for any and all liabilities and obligations with respect to any Hired Employee or Seller Employee resulting from events occurring on or prior to the Closing Date or arising from the transactions contemplated herein.

7.6   **Disability.** Notwithstanding anything in this Agreement to the contrary, any employee who, on the Closing Date, is on either short-term or long-term disability shall not be extended an offer of employment by Buyer and shall remain the responsibility of Seller.

8.   **Representations and Warranties of Seller and the Shareholders.** Seller and the Shareholders hereby, jointly and severally, represent and warrant to and with Buyer as follows:

8.1   **Organization, Good Standing and Corporate Power.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the corporate power to own, operate and lease its properties and carry on its business as now being conducted. Seller is qualified to do business in those jurisdictions set forth in Section 8.1 of the Disclosure Schedule (the "Disclosure Schedule"), dated as of the date hereof and delivered as a separate document, the contents of which are incorporated herein by reference. Such jurisdictions constitute all jurisdictions in which such qualification or authorization is required, except for jurisdictions in which failure to be so qualified or authorized would not have a material adverse effect on the business or operations of Seller.

8.2   **Corporate Authorization; Binding Effect.** The execution, delivery and performance of this Agreement by Seller has been duly authorized by the Board of Directors and the shareholders of Seller. This Agreement and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Seller and constitutes the legal, valid and binding obligation of Seller and the Shareholders enforceable against each in accordance with its terms.

8.3 **No Conflict with Other Instruments or Agreements.** The execution, delivery and performance of this Agreement by Seller and the Shareholders, will not result in a breach or violation of, or constitute a default under Seller's Certificate of Incorporation or By-Laws, or any agreement to which Seller or either Shareholder is a party or by which Seller or either Shareholder is bound or to which any of its respective property is subject, and will not be in violation of any statute, judgment, order, rule or regulation of any court, or any federal, state or other regulatory authority or governmental body having jurisdiction over Seller or either Shareholder in effect at the date hereof.

8.4 **No Authorization Required.** No consent, approval, authorization or order of, or qualification with, any court, regulatory authority, governmental body or any third party is required for the consummation by Seller or either Shareholder of the transactions contemplated by this Agreement.

8.5 **Effect of Agreement.** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby will not, with or without the giving of notice or the lapse of time or both, (a) violate any provision of law, statute, rule or regulation to which Seller or either Shareholder is subject; (b) violate any judgment, order, writ or decree of any court applicable to Seller or either Shareholder; (c) have any effect on any of the permits, licenses, orders or approvals held or utilized by Seller; or (d) result in the breach of, or conflict with, any term, covenant, condition or provision of, result in the modification or termination of, constitute a default under, or result in the creation or imposition of any lien, security interest, charge or encumbrance upon any of the properties or assets of Seller, pursuant to any corporate charter, by-law, commitment, contract or other agreement or instrument to which Seller or either Shareholder is a party or by which Seller or either Shareholder or any of its respective assets or property is or may be bound or affected or from which Seller or either Shareholder derives substantial benefits.

8.6 **Financial Statements.** Seller has heretofore delivered to Buyer copies of Seller's compiled balance sheets for the calendar years ended December 31, 2003, 2002 and 2001, and the related compiled statements of income for the years then ended. Seller has also delivered to Buyer copies of its unaudited balance sheets and related statements of income for the monthly period ended May 31,2004. All such financial statements are collectively referred to as the "Financial Statements". The Financial Statements present fairly the financial position and results of operation of Seller as of the years and period then ended, in conformity with generally accepted accounting principles applied on a basis consistent with prior years and periods. The Financial Statements do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business. Seller has not used any improper accounting practice for the purpose of not reflecting or incorrectly reflecting in the financial statements or books and records of Seller any properties, assets, liabilities, revenues or expenses, and all books and records of Seller have been maintained and prepared in conformity with generally accepted accounting principles, consistently followed.

8

8.7    **Absence of Undisclosed Liabilities.** Except as set forth in <u>Section 8.7</u> of the Disclosure Schedule, the Financial Statements as of December 31, 2003 do, and the Closing Balance Sheet will, make full and adequate provision for or disclosure of all obligations, liabilities or commitments (fixed and contingent) of the Seller which are required to be disclosed or reserved for in accordance with generally accepted accounting principles, applied on a basis consistent with the Seller's prior accounting practices and, as of December 31, 2003, the Seller had no obligations, liabilities or commitments (fixed or contingent) which were required to be reserved against in the Financial Statements or disclosed in the notes thereto in accordance with generally accepted accounting principles, applied on a basis consistent with Seller's prior accounting practices.

8.8    **Title to Assets, Absence of Liens, Condition of Assets.** Except as disclosed in <u>Section 8.8</u> of the Disclosure Schedule, Seller has good and marketable title to all of the Assets, free and clear of all pledges, liens, defects, leases, licenses, equities, conditional sales contracts, charges, claims, encumbrances, security interests, easements, restrictions, chattel mortgages, mortgages or deeds of trust (collectively, the "Liens"), and the instruments of conveyance, and other endorsements and instruments of transfer and assignment contemplated by this Agreement are sufficient to transfer good and marketable title to the Assets to Buyer, free and clear of all Liens. The Assets are in good and usable condition, ordinary wear and tear excepted, are in good repair and have been maintained in accordance with good business and maintenance practice. Neither Seller nor the Shareholders know of any latent defects in the Assets.

8.9    **Assets.** Except for the real estate subject to the Lease, there is no asset used or required by Seller in the conduct of the Business which is not either transferred or leased to Buyer pursuant to this Agreement or subject to the leases set forth in <u>Exhibit 1.7</u> attached thereto.

8.10   **Inventories.** The items of Inventories sold pursuant to this Agreement are suitable for use in connection with the Business and are of a quantity usable in the ordinary course of business.

8.11   **Licenses, Permits and Orders.** <u>Exhibit 1.8</u> contains a true, complete and correct list of all qualifications, registrations, filings, approvals, authorizations, consents, licenses, orders and other permits of all governmental agencies, whether federal, state, or local, owned, held or utilized by Seller (collectively, "Licenses and Permits"). All such Licenses and Permits constitute the only approvals, authorizations, consents, licenses, orders and permits which Seller is required to own, hold or utilize in order to own, operate and lease its properties and carry on the Business as now being conducted and Seller is not presently in violation of any thereof. All such Licenses and Permits are in full force and effect and no suspension or cancellation of any of them is pending or, to Seller's or the Shareholders' knowledge, threatened, and no basis for suspension or cancellation exists. Seller will cooperate with Buyer with respect to Buyer's acquisition or assumption of all

9

such Licenses and Permits and securing the transfer of all such Licenses and Permits to Buyer.

8.12    **Real Property.**  Section 8.12 of the Disclosure Schedule contains a true, complete and correct list and description of all real estate that is leased by Seller and Seller has made available to the Buyer true and correct copies of all such leases. Except as set forth in Section 8.12 of the Disclosure Schedule, Seller is not in default under any such lease. All buildings, structures and other improvements located on any parcel of real estate leased by Seller are structurally sound with no material defects. Neither Seller nor either Shareholder has received any notification that there has been any violation of any building, zoning or other law, ordinance or regulation in respect of such buildings, structures and other improvements and no such violation exists. Each item of real property not owned by Seller is in such condition that upon return of such property to its owner in its present condition, subject to ordinary wear and tear, at the end of the relevant term or as otherwise contemplated by the respective agreement, Seller's obligations to such owner or lessor will be discharged.

8.13    **Leased Personal Property.**   There is listed in Section 8.13 of the Disclosure Schedule all assets (other than the real estate described in Section 8.12 of the Disclosure Schedule) leased by Seller. Except as disclosed in Section 8.13 of the Disclosure Schedule, each item of such personal property is presently in such condition that upon the return of such property to its owner or lessor in its present condition at the end of the relevant lease term or as otherwise contemplated by the applicable agreement between and the owner or lessor thereof, Seller's obligations to such owner or lessor will be discharged.

8.14    **List of Contracts and Other Data.**  Section 8.14 of the Disclosure Schedule sets forth, as of the date of this Agreement, a listing of the following, true and correct copies of which have been furnished to Buyer:

8.14.1  All policies of liability, theft, fidelity, life, fire and other forms of insurance presently held or within the past three (3) years held by or for the benefit of Seller, specifying the insurer, amount of coverage, type of insurance, policy number, pending liability claims thereunder of which Seller or either Shareholder has notice and a summary of claims made under such policies of insurance during the past three (3) years. Except as reflected in Section 8.14 of the Disclosure Schedule, Seller has not, during the past three (3) years, been denied or had revoked or rescinded by a carrier any policy of insurance. Seller has not failed to give any notice or present any material claim under any insurance policy in due and timely fashion.  There are no outstanding requirements or recommendations by any insurance company that wrote any such policy or by any Board of Fire Underwriters or similar body exercising similar functions or by any governmental authority which requires or recommends changes in the conduct of the business of, or repairs or other work to be done or with respect to any of the properties, assets or operations of Seller or requiring any equipment or facilities to be installed on or in connection with any of the properties or assets of Seller;

8.14.2 All existing contracts and commitments (including without limitation, mortgages, licenses, leases, indentures, guaranty and indemnification agreements, loan agreements, dealer, franchise distribution agreements, advertising contracts, patent, trademark and similar licenses, and other agreements and contracts), whether written or oral, to which Seller is a party, or to which it or any of its assets or properties are subject or bound;

8.14.3 All employment and consulting agreements, executive compensation plans, bonus plans, deferred compensation agreements, employee pension plans, retirement plans, golden parachutes, thrift plans, severance plans, employee profit sharing plans, savings plans, group life insurance, hospitalization insurance, or other plans or arrangements, whether written or oral, providing for benefits for employees of Seller;

8.14.4 A true, correct and complete list of the names and current annual compensation (including wages, salaries, bonuses and benefits under pension, profit sharing, deferred compensation and similar plans or programs) of all of Seller's employees and information concerning years of service and seniority.

8.15 **Compliance With Agreements.**  Neither Seller nor, to Seller's and the Shareholders' knowledge, any other person, firm, corporation or entity is in breach of, or in default under, any agreement, contract or commitment described in Section 8.14 of the Disclosure Schedule.  No state of facts exists or event has occurred, is pending or, to the knowledge of Seller and the Shareholders, is threatened or contemplated, which, after the giving of notice, the lapse of time or otherwise, could constitute or result in a breach or a default by Seller or any other person, firm, corporation or entity, of any such agreement or commitment.  All such contracts and agreements are, and after consummation of the transactions contemplated herein will be, legal, valid and binding obligations of the respective parties thereto.

8.16 **Litigation.**  Section 8.16 of the Disclosure Schedule contains a true, complete and correct list and caption of each pending lawsuit, claim, administrative proceeding, arbitration, labor dispute or governmental investigation or inspection to which Seller is a party or which involve or affect the Business or the operations or assets of Seller.  With respect to each such proceeding, Section 8.16 of the Disclosure Schedule discloses the name of the counsel for each party, location of the proceeding, a description of the nature of such proceeding and its current status.  To the knowledge of Seller and the Shareholders, there are no claims, legal actions or governmental investigations threatened against Seller.  Section 8.16 of the Disclosure Schedule further describes all material (individually or in the aggregate) product liability claims received by Seller during the past five (5) years.  Neither Seller nor any of its officers, directors, or key employees have been permanently or temporarily enjoined or barred by order, judgment or decree of any court or other tribunal or any agency or self-regulatory body from engaging in or continuing any conduct or practice in connection with the business engaged in by Seller.  There is

11

no continuing order, judgment or decree of any federal, state or local court, arbitrator or other tribunal or any governmental or administrative agency or self-regulatory body enjoining Seller from taking or requiring it to take any action of any kind or to which Seller or the Business, operations or assets are subject to or by which it is or may be bound. Seller is not in default under any order, writ, injunction or decree of any federal, state or local court. Neither Seller nor the Shareholders have any knowledge of any state of facts or contemplated event which may give rise to any claim, action, suit, proceeding, complaint, investigation or inspection which could materially adversely affect Seller's Business, operations or assets.

8.17    **Labor Matters.** Seller is not a party to any collective bargaining agreement. On the date hereof, there are no material controversies pending or, to the knowledge of Seller and the Shareholders, threatened between Seller and any of its employees, and Seller's relations with its employees are good. Seller is in compliance with all federal, state and local laws, rules and regulations respecting employment and employment practices, terms and conditions of employment and wages and hours, and has withheld all amounts required by law or agreement to be withheld from the wages or salaries of its employees and is not liable for any arrears wages or any taxes, interest or penalties for failure to comply with any of the foregoing. Seller has not been and is currently not engaged in any unfair labor practice nor has Seller discriminated in any respect on the basis of age, sex, religion or national origin in its employment conditions or practices. There are no unfair labor practices or age, sex, religion or national origin discrimination complaints pending or, to the knowledge of Seller and the Shareholders, threatened against Seller before any federal, state or local board, department, commission or agency, nor, to the knowledge of Seller and the Shareholders, does any basis exist therefor. There are no existing or, to the knowledge of Seller and the Shareholders, threatened labor strikes, disputes, grievances, controversies or other material labor troubles affecting Seller nor, to the knowledge of Seller and the Shareholders, does any basis therefor exist. There are no pending, or to the knowledge of Seller and the Shareholders, threatened representation questions respecting the employees of Seller and, to the knowledge of Seller and the Shareholders, no basis therefor exists.

8.18    **Transactions with Management.** Except as disclosed in Section 8.18 of the Disclosure Schedule, no shareholder, director, officer or key employee of Seller and no relative of any such shareholder, director, officer, or key employee, (i) owns any shares of stock or other securities of, or has any other direct or indirect interest in, any firm, corporation, partnership or other entity or business which has a business relationship (as creditor, lessor, lessee, supplier, dealer, distributor, franchisee, licensee, customer or otherwise) with Seller; (ii) owns, or has any other direct or indirect interest in any process, invention, know-how, formula, trade secret, trade marks, trade names, service marks, service names, brand marks, brand names, labels or registrations or licenses thereof or applications therefor or other right, property or asset which is used in or which is required in the ownership or operation by Seller of its properties and assets, or to otherwise carry on and conduct its businesses and affairs; or (iii) has any other contractual relationship with Seller.

8.19 **Relationship With Suppliers and Customers.** The relationship of Seller with its suppliers, distributors and customers is satisfactory and neither Seller nor the Shareholders have received notice of any intention to terminate or materially modify any of such relationships and there exists no reason why the transactions contemplated herein will adversely affect such relationships.

8.20 **Tax Matters.** Seller has duly filed all federal, state, county and local tax returns required to be filed, including those with respect to income, withholding, Social Security, unemployment, franchise, excise, sales and use taxes, and has paid in full all taxes, interest, penalties, assessments or deficiencies shown to be due on such returns and reports or claimed to be due on such tax returns and reports. No claims for additional taxes are pending or, to the knowledge of Seller and the Shareholders, threatened with respect thereto for any prior fiscal year which would affect the Assets or the transfer thereof to Buyer.

8.21 **Intellectual Property.**

8.21.1 Section 8.21.1 of the Disclosure Schedule contains a true, complete and correct list of: (i) all patent registrations and all pending applications for patent registrations which Seller owns or is using in connection which the Business or the use of which is necessary for the conduct of the Business as currently being conducted ("Patents"), (ii) all trademarks, service marks, and trade names, and all registrations and pending applications relating thereto, which Seller owns or is using in connection with the Business or the use of which is necessary for the conduct of the Business as currently being conducted ("Trademarks"), and (iii) all copyrights and all copyright registrations and applications relating thereto which Seller owns or is using in connection with the Business or the use of which is necessary for the conduct of the Business ("Copyrights").

8.21.2 Except as disclosed in Section 8.21.2 of the Disclosure Schedule, (i) Seller owns all right, title and interest in and to the Trademarks, Patents and Copyrights; (ii) all of the Trademarks, Patents and Copyrights are in good standing, valid and subsisting and in full force and effect in accordance with their terms; (iii) no impediment exists to Seller's exclusive ownership, use and validity of any of the Trademarks, Patents and Copyrights; (iv) no other person, corporation, partnership, joint venture, organization, association or entity owns any interest in or uses in any way any of the Trademarks, Patents and Copyrights; (v) none of the Trademarks, Patents or Copyrights are involved in, nor are the subject of, any pending or threatened infringement, interference, opposition, or similar action, suit or proceeding or has otherwise been challenged in any way; and (vi) neither the ownership or operation of the Business and the Assets by Seller, nor the production, manufacture, marketing, sale or distribution by Seller of the Business' products, nor the use of any product of the Business for the purposes for which sold, infringes upon or conflicts with any patent, trademark, trade

13

name, service mark, copyright, privilege, franchise, immunity or right of any other person, firm, corporation or entity.

8.21.3    <u>Section 8.21.3</u> of the Disclosure Schedule contains a list of all agreements, contracts and commitments to which Seller is a party (including, without limitation, licenses and other such agreements), whether written or oral, which affect any of the Trademarks, Patents or Copyrights.   Except as disclosed in <u>Section 8.21.3</u> of the Disclosure Schedule, such licenses and agreement are valid, binding and enforceable in accordance with their respective terms for the periods stated therein, and there is no existing default or event of default thereunder or any event which with notice and/or lapse of time would constitute a default.

8.21.4    Except as set forth in <u>Section 8.21.4</u> of the Disclosure Schedule, Seller does not use any material licensed software in the Business.

8.22    **Compliance with Laws.**  Seller has owned and operated, and currently owns and operates, its properties and assets, procured, processed, stored and sold its services, and otherwise carried on and conducted its business in compliance with all federal, foreign, state and local laws, ordinances, rules and regulations.  <u>Section 8.22</u> of the Disclosure Schedule sets forth for the past five (5) years all investigations, inspections or citations under any health, environmental, safety or other applicable laws and regulations and under any other federal, state or local laws or regulations and the results thereof together with a description of all corrective or other action taken with respect thereto.  Except as set forth in <u>Section 8.22</u> of the Disclosure Schedule, there are no pending governmental investigations, inspections or citations. The Assets and all assets subject to leases described in <u>Exhibit 1.7</u> are being used and occupied, and are located and constructed, in compliance with, and conform to all applicable federal, state and local laws, rules, regulations and ordinances.

8.23    **Environmental Matters.**  For purposes of this Agreement, "Hazardous Substances" shall have the same meaning as the term "Hazardous Substance" in 42 U.S.C. 9601(14) and the term "Pollutant or Contaminants" shall have the same meanings as the term "Pollutant or Contaminant" in 42 U.S.C. 9601(33).  In addition, "Hazardous Substances" and "Pollutants or Contaminants" shall include any hazardous substances or pollutants and contaminants or other dangerous, toxic, or hazardous substances, materials, or waste as defined in or governed by any other federal, state or local statute, law, regulation or other requirement relating to any Hazardous Substances, Pollutants or Contaminants, or to human health and safety of the environment.  The terms Hazardous Substances and Pollutants and Contaminants shall include, without being limited to, urea-formaldehyde, polychlorinated biphenyls, asbestos-containing materials, nuclear fuel or waste, petroleum products, and any other waste, material, substance, pollutant or contaminant which might subject the owner or lessee of the Assets to any claims, demands, damages, costs, expenses or other liabilities under any applicable federal, state, or local statute, law, regulation or other requirement.

14

No person, entity, or governmental agency has asserted against Seller any requests for damages, costs, or expenses, demands, causes of action or claims, however defined, arising out of or due to the emission, disposal, discharge or other release or threatened release of any Hazardous Substances or Pollutants or Contaminants in connection with or related to Seller's present or past facilities, properties or assets, owned, leased or otherwise (collectively, the "Properties"), or arising out of or due to any injury to human health or the environment by reason of the current condition or operation of the Properties, or past conditions and operations or activities on the Properties. There are no pending, threatened, or anticipated requests for damages, costs, or expenses, demands, causes of action, claims, lawsuits, administrative proceedings, enforcement actions, or investigations, or notice of any of these related to the Properties. There is no environmental condition, situation, or incident on, at or concerning the Properties that could give rise to an action or liability under any law, rule, ordinance, or common laws theory and further, there is no liability under CERCLA, RCRA, or TSCA or under any other statute, including state law, similar to CERCLA, RCRA or TSCA.

To Seller's and the Shareholders' knowledge: (a) there has not been, and is not now occurring, any release (as that term is defined in 42 U.S.C. 9601(22)), or threatened release, emission, disposal, discharge at or from the Properties of any Hazardous Substances or Pollutants or Contaminants, (b) no part of the Properties has been used as a landfill, dump, or other disposal area for Hazardous Substances, Pollutants or Contaminants and Seller has not caused or permitted the Properties to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer or process Hazardous Substances or Pollutants or Contaminants, or other solid wastes, except in compliance with all applicable federal, state, and local laws and regulations or requirements, (c) no underground storage tanks (whether or not currently in use) are located at the Properties, to include underground pipelines located in or under the Properties, and there are no underground storage tanks or underground pipelines located at any adjoining location, and (d) no Hazardous Substances or Pollutants or Contaminants are present at the Properties, whether stored, treated, disposed of, or managed in violation of applicable environmental laws, and there are no such Hazardous Substances or Pollutants or Contaminants at any adjoining location. There have been no investigations, inspections, or inquiries of any kind with respect to the Properties by any governmental authority which in any way pertain to Hazardous Substances or Pollutants or Contaminants or the violation or potential violation of any statutes, laws, regulations or other requirements relating to the environment or human health or safety. Seller is not currently being charged with any violation of, and Seller is operating, and to Seller's and the Shareholders' knowledge, at all times has operated, in its business and in connection with the Properties in compliance with all applicable foreign, federal, state, and local statutes, laws or regulations or other requirements relating to the environment or human health and safety, including, but not limited to, laws, regulations, or requirements relating to emissions, disposals, discharges, releases or threatened releases of Hazardous Substances or Pollutants or Contaminants into ambient air, surface water, groundwater, and, subsurface soil, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal,

transport or handling of Hazardous Substances or Pollutants or Contaminants. Seller has all necessary permits, registrations, and licenses regarding its business and operations.

To Seller's and the Shareholders' knowledge, no expenditures will be required in order for the Buyer to comply with any existing environmental statute law, regulation or other requirement in connection with the Properties after Buyer acquires the Assets from Seller, including, without limitation, expenditures relating to the clean up, removal, response actions, corrective actions, or closure actions relating to any Hazardous Substance or Pollutants or Contaminants which may have been discharged, emitted, disposed of, or released prior to Closing at or from the Properties.

To Seller's and the Shareholders' knowledge, there is no state or federal lien on the Properties resulting from any clean up or response actions related to Hazardous Substances or Pollutants or Contaminants at or from the Properties by state or federal authorities.

To Seller's and the Shareholders' knowledge, the Properties are not identified on the National Priorities List under 40 CFR 300, Appendix B, the Comprehensive Environmental Response Compensation and Liability Inventory Systems (CERCLIS), or any list arising from a state law similar to CERCLA.

To Seller's and the Shareholders' knowledge, Seller is in compliance with the provisions of any legal requirement relating to public or community right-to-know or notification, including the provisions of Sections 102 and 103 of CERCLA (42 U.S.C. 9602 and 9603), Section 133 of the Clean Water Act (33 U.S.C. 1321), and the Emergency Planning and Community Right-to-Know Act of 1986.

Neither Seller nor the Shareholders have any knowledge of impending changes or events that will substantially affect the Buyer's ability to comply with environmental legal requirements or to obtain and maintain in effect the governmental authorizations or licenses necessary to permit construction, modification or operation of the Properties, including any reallocation of water quality-based effluent limitations, consumption of air quality increments, land disposal bans, demands or requests for corrective action, or equipment and inadequacies.

8.24    **Conduct of Business Since December 31, 2003.**   Except as disclosed in Section 8.24 of the Disclosure Schedule, since December 31, 2003:

    (i)    The business and affairs of Seller has been conducted and carried on only in the ordinary course consistent with its past practices.

    (ii)    Except for personal property purchased, sold or leased in the ordinary course of business consistent with its past practices, Seller has not purchased, sold, leased, mortgaged, pledged or otherwise acquired or disposed of any material properties or assets.

16

(iii)   There has been no increase or other change made in the rate or nature of the compensation, including wages, salaries, bonuses and benefits under employee benefit plans which has been paid, or will be paid or payable, by Seller to any officer or employee of Seller.

(iv)   Seller has not sustained or incurred any loss or damage (whether or not insured against) on account of fire, flood, earthquake, accident or other calamity which has interfered or affected, or may interfere with or affect, Seller's properties and assets or the business conducted by Seller.

(v)   There has been no adverse change in or with respect to the financial condition, operations, management, rights, properties, assets, liabilities or results of operations of Seller or its business, or its relationship with its employees, creditors, suppliers or others having business relationships with Seller and no state of facts exists which may reasonably be expected to give rise to any such changes.

(vi)   Seller has not entered into any transaction, settlement agreement, consent decree, contract or commitment which, by reason of its size, nature or otherwise is not in the ordinary course of business.

(vii)   Seller has not incurred any obligations or liabilities (whether absolute, accrued, contingent or otherwise and whether due or to become due), except in the ordinary course of business consistent with past practices.

(viii)   Seller has not repaid any principal on debts not assumed by Buyer in accordance with the terms of this Agreement.

8.25   **Receivables.** All Receivables (i) are reflected properly on the Financial Statements, (ii) have arisen only from bona fide transactions in the ordinary course of Seller's business, (iii) are valid Receivables subject to no setoffs, counterclaims or other defenses, (iv) are current and collectable, and (v) will be collected in accordance with their terms at their recorded amounts.

8.26   **Brokers and Finders.** Except for Corporate Development Advisors, neither Seller nor the Shareholders have employed any investment banker, broker or finder, or incurred any liability for any brokerage fees, commissions or finder's fees in connection with the transactions contemplated by this Agreement.  Seller and the Shareholders shall be sole responsible for all fees, commissions and expenses of Corporate Development Advisors.

8.27   **Disclosure and Reliance.** Seller and the Shareholders have disclosed to Buyer all facts material to the transactions contemplated in this Agreement.  None of the information, documents, certificates or instruments furnished or to be furnished by Seller or the Shareholders or any of their representatives to Buyer or any of its representatives in connection with this Agreement or otherwise in connection with the transactions contemplated thereby or hereby are false or misleading in any material respect or contain any material misstatement of fact or omit to state any

17

material facts required to be stated to make the statements therein not misleading. The representations and warranties made herein are made by Seller and the Shareholders with the knowledge and expectation that Buyer is placing reliance thereon. To the extent that any portion of the representations and warranties made herein were made to Seller's or the Shareholders' knowledge, Seller and the Shareholders represent that they have made due and reasonable inquiry with respect thereto.

9.    **Representations and Warranties of Buyer**.  Buyer represents and warrants to and with Seller as follows:

9.1    **Organization, Power**.  Buyer is a limited liability company duly organized, existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own, operate and lease its properties, and to carry on its business as now being conducted and to enter into this Agreement and perform its obligations hereunder.

9.2    **Authority Relative to Agreement**.  The execution, delivery and performance of this Agreement by Buyer and the consummation by it of the transactions contemplated hereby, have been approved by all necessary action on the part of Buyer and this Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms.

9.3    **No Authorization Required**.  No consent, approval, authorization or order of, or qualification with, any court, regulatory authority, other governmental body or third party is required for the consummation by Buyer of the transactions contemplated by this Agreement.

10.    **Indemnification of Buyer by Seller and Speier**.

10.1    **Indemnity**.  Seller and Speier shall, and hereby agree to, jointly and severally, indemnify and hold Buyer harmless against and in respect of:

10.1.1    All debts, liabilities and obligations of Seller of any nature, whether accrued, absolute, contingent, or known or unknown on the date hereof, existing or arising on or resulting from events which occurred or failed to occur on or before the date hereof, to the extent not specifically assumed by Buyer hereunder;

10.1.2    Any claim, action, loss, damage or cost relating to or arising by reason of the presence of, or any governmental or third party requirements relating to the disposal or arranging for disposal (on-site or off-site), or the release or threatened release prior to the date hereof, of any Hazardous Substances, Pollutants or Contaminants in, on, to, under, upon, or from any of the Properties, or any claim, action, loss, damage or cost relating to or arising by reason of any violation or operation of any applicable federal, state or local statute or regulation pertaining to the protection of the environment or the

18

regulation, control, release or remediation of Hazardous Substances, Pollutants or Contaminants which occurs prior to the date hereof in, on, under, upon or from any of the Properties, or any part thereof, or which otherwise apply to the activities at the Properties;

10.1.3 Any liability, loss, claim, damage or deficiency resulting directly or indirectly from any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Seller or either Shareholder under this Agreement, or from any misrepresentation in or omission from any certificate or other instrument furnished or to be furnished to Buyer hereunder;

10.1.4 Any liability, claim or obligation relating to or arising in connection with the termination of Seller's employees or in connection with or as a result of the transactions contemplated herein; and

10.1.5 All other actions, suits, proceedings, demands, assessments, adjustments, costs and expenses incident to the foregoing, including, without limitation, reasonable attorneys' fees and other out-of-pocket expenses.

10.2    **Notice of Claims.** Buyer agrees to give Seller notice of any and all claims asserted against Buyer for which indemnification is or may be sought under this Section 10. Such notice shall be given within a reasonable time after receipt of written notice of such claim by Buyer. Failure to give such notice shall not abrogate or diminish Seller's or Speier's obligation under this Section 10 if Seller or Speier has or receives knowledge of the existence of any such claim by any other means or if such failure does not prejudice Seller's or Speier's ability to defend such claim.

10.3    **Defense of Claim.** In any litigation, administrative proceeding, negotiation or arbitration pertaining to any claim for which indemnification is sought under this Section 10, Seller and Speier shall have the right to select legal counsel to represent Buyer and to otherwise control such litigation, proceedings, negotiations and arbitration. If Seller and Speier elect to control such litigation, proceeding, negotiation or arbitration, Buyer shall at all times have the right to fully participate in the defense at its own expense. If Seller and Speier shall, within a reasonable time after notice, fail to defend, Buyer shall have the right, but not the obligation, to undertake the defense of and to compromise or settle the claim or other matter on behalf, for the account, and at the risk of Seller and Speier. If the claim is one that cannot by its nature be defended solely by Seller and Speier then Buyer shall make available all information and assistance as Seller and Speier may reasonably request, at Seller's and Speier's expense. Notwithstanding the foregoing provisions of this Section 10, should the subject matter of any litigation, proceeding, negotiation or arbitration include a claim seeking permanent injunctive relief, Buyer shall have the right to take exclusive control of the defense of the entire proceeding.

19

10.4  **Cooperation.** The parties hereto shall cooperate in connection with the defense of third party actions giving rise to any claim made pursuant to this Section 10 and shall use reasonable efforts to provide available information regarding such claim and to keep the parties hereto informed as to the status of any such action.

10.5  **Time Limits.** Buyer may not seek indemnification under this Section 10 in respect to any claim unless written notice of such claim has been given to Seller prior to the third (3rd) anniversary of the Closing Date. Notwithstanding the foregoing, the parties agree that other time limits shall be as follows:

    10.5.1  Any claim with respect to any breach of the representations and warranties under Section 8.2 or the first sentence of Section 8.8, and the indemnities under this Agreement relating thereto, shall all survive the Closing without limitation.

    10.5.2  Any claim with respect to any tax-related matter affecting Seller, including any breach of the representations and warranties under Section 8.20, and the indemnities under this Agreement relating thereto, shall all survive the Closing until expiration of all applicable statutes of limitation (as may have been extended prior to the Closing Date).

10.6  **Maximum Liability.** Except for any claim relating to any breach of the representations and warranties under Section 8.2, the first sentence of Section 8.8, any tax-related claim and any claim resulting from intentional misrepresentation, fraud or criminal misconduct, as to which no limit on Seller's and Speier's liability shall exist, the aggregate liability of Seller and Speier pursuant to this Section 10 shall not exceed One Million Two Hundred Fifty Thousand Dollars ($1,250,000).

10.7  **Basket.** Except for any claim relating to any breach of the representations and warranties under Section 8.2, the first sentence of Section 8.8, any tax-related claim, any claim resulting from intentional misrepresentation, fraud or criminal misconduct, as to which no limitation shall apply, Seller and Speier shall have no liability pursuant to this Section 10 except to the extent the aggregate liability pursuant thereto exceeds Twenty Five Thousand Dollars ($25,000) and then such liability shall be limited to any amount in excess thereof.

11.  **Noncompetition Agreement.** In order to further induce Buyer to enter into this Agreement and consummate the transactions contemplated hereunder, Seller and the Shareholders each agree that, during the five (5) year period commencing on the date hereof, they shall not, within the Trade Area (as defined below) associate in any capacity whatsoever, whether as a promoter, shareholder, investor, owner, partner, lessee, lessor, employee, consultant, lender, agent, broker or otherwise, in any business engaged in by Seller prior to the Closing Date or any related business of a type competitive, directly or indirectly, with the business of Seller as conducted by Buyer following the Closing hereunder. If Seller or either Shareholder fails to keep and perform every covenant of this Section 11, Buyer shall be entitled to specifically enforce the same by injunction in equity in addition to any other remedies which Buyer may have. If any portion of this

Section 11 shall be invalid or unenforceable, such invalidity or unenforceability shall in no way be deemed or construed to affect in any way the enforceability of any other portion of this Section 11. If any court in which Buyer seeks to have the provisions of this Section 11 specifically enforced determines that the activities, time or geographic area hereinabove specified are too broad, such court may determine a reasonable activity, time or geographic area and shall specifically enforce this Section for such activity, time and geographic area. The covenants on the part of Seller and the Shareholders under this Section 11 shall be construed as an agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action by Seller and the Shareholders against Buyer or any corporation affiliated with Buyer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Buyer of said covenants. For purposes of this Section 11, "Trade Area" shall mean North America.

12.     **Covenant Not to Disclose.**  Seller and the Shareholders agree that they each possess certain data and knowledge of operations of the Business which are proprietary in nature and confidential, including, without limitation, certain trade secrets, all of which have become the property of Buyer as a result of the transactions contemplated under this Agreement.  Seller and the Shareholders covenant and agree that they will not, at any time after the Closing, reveal, divulge or make known to any person (other than Buyer) or use for their own account or for the account of any person, firm, corporation or other organization, any confidential or proprietary process, record, data, trade secret, pricing policy, bid amount, bid strategy, rate structure, personnel policy, method or practice of soliciting or obtaining or doing business by the Business, or any other confidential or proprietary information whatsoever relating to the Business, whether or not obtained with the knowledge and permission of Buyer or its affiliates.

13.     **Public Announcements.** No party hereto will issue any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written approval of the other parties.

14.     **Prorations.**  The parties hereto understand and agree that all utility accounts will be read as of the commencement of business on the date hereof.  Seller shall be responsible for all utility charges accruing up to said time and date and Buyer shall be responsible for all utility charges accruing thereafter.  In addition, all rent, taxes and other charges due under the leases and contracts set forth in Exhibit 1.7 hereof shall be prorated to the date hereof.  All real and personal property taxes which are assessed for calendar year 2004 shall be prorated to the date hereof and all prior taxes shall be paid by Seller.

15.     **Expenses.**  Each party hereto shall pay its own costs and expenses incurred in connection with the negotiation and preparation of this Agreement and the consummation of the transactions contemplated herein; provided, however, that Seller shall pay any sales, use and transfer taxes incurred in connection with the transfer of the Assets.

16.     **Miscellaneous.**   The following miscellaneous provisions shall apply to this Agreement:

16.1    **Notices.**  All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if given in

21

writing and delivered personally or mailed by Registered, Certified or Express mail, postage prepaid, as follows:

**If to Seller, Speier or the**          *David T. Speier*
**Shareholders:**                        *11917 Cedar Creek Rd.*
                                         *Bishopville, Md 21813*
                                         ATTN: *David T. Speier*

**If to Buyer:**                         Valmont Structures, Inc.
                                         One Valmont Plaza
                                         Omaha, NE 68154
                                         ATTN:   Mark E. Treinen, Vice President
                                                 Business Development

or at such other address as any party hereto shall have designated by notice in writing to the other parties hereto.

16.2   **Waivers.**  Any party hereto may, by written notice to the other party hereto, (i) extend the time for performance of any of the obligations or other actions of the other under this Agreement, (ii) waive any inaccuracies in the representations and warranties of the other contained in this Agreement or in any documents delivered pursuant to this Agreement, (iii) waive compliance with any of the conditions or covenants of the other contained in this Agreement, or (iv) waive or modify performance of any of the obligations of the other under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement.  The waiver by any party hereto of a breach of any portion of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

16.3   **Entire Agreement.**  This Agreement, the Lease and the Employment Agreements constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral and written, among the parties hereto with respect to the subject matter hereof.

16.4   **Applicable Law.**  This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in Delaware.

16.5   **Binding Effect, Benefits.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and assigns; nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their respective heirs, successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

22

Page 3 of 37 received on 7/30/2004 3:27:18 PM [Central Daylight Time] on server APPS2.

16.6  **Assignability.**  Neither this Agreement nor any of the parties' rights hereunder shall be assignable by any party hereto without the prior written consent of the other party hereto.

16.7  **Effect of Headings.**  The headings of the various sections and subsections herein are inserted merely as a matter of convenience and for reference and shall not be construed as in any manner defining, limiting or describing the scope or intent of the particular sections to which they refer, or as affecting the meaning or construction of the language in the body of such sections.

16.8  **Exhibits, Disclosure Schedule.**  All exhibits and schedules referred to in this Agreement are attached hereto and are incorporated herein by reference as if fully set forth herein.  For purposes of this Agreement, any item in the Disclosure Schedule shall be deemed disclosed only in connection with the representations or warranties to which it is specifically referred.

16.9  **Construction.**  The language in all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, strictly neither for nor against any party hereto, and without implying a presumption that the terms thereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the person who himself or through his agent prepared the same, it being agreed that representatives of both parties have participated in the preparation hereof.

IN WITNESS WHEREOF, the parties have each executed this Agreement on the date first above written.

SELLER:

**SIGMA INDUSTRIES, INC.**, a Delaware corporation

By: _____
Its: _Presiden t_

SHAREHOLDERS:

_____
**DAVID T. SPEIER**

_____
**JOHN J. ASHMAN**

BUYER:

**VALMONT STRUCTURES, INC.**, a Delaware corporation

By: _Mark E. Greisen_
Its: _VICE PRESIDENT BUSINESS DEVELOPMENT_

24

JS 44

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFF**
Valmont Structures, Inc.

**DEFENDANTS**
David T. Speier and S-Windup, Inc.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF New Castle Co., DE
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ Worcester Co., MD
( IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Lisa A. Schmidt, Esq.
K. Tyler O'Connell, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

ATTORNEYS (IF KNOWN)

**II.   BASIS OF JURISDICTION** (PLACE AN X IN ONE BOX ONLY)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

■ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ■ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ■ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders Suits
■ 190 Other Contract
☐ 195 Contract Product Liability

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth In Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
HABEAS CORPUS:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl Ret Inc Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reappointment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

■ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI.   CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
Action for breach of an asset purchase agreement and common law fraud

**VII. REQUESTED IN**
**COMPLAINT:**   CHECK IF THIS IS A **CLASS ACTION**
☐ Under F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ■ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY** (see instructions): _____ Docket Number _____

DATE
July 28, 2006

SIGNATURE OF ATTORNEY OF RECORD
*K. Tyler O'Connell (DE Bar ID No. 4514)*

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT _____   APPLYING IFP_____   JUDGE _____   MAG. JUDGE _____

RLF1-3034466-1

AO FORM 85 RECEIPT (REV. 9/04)

## United States District Court for the District of Delaware

Civil Action No. _0 6 - 4 6 1_

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___2___ COPIES OF AO FORM 85.

_7 | 28 | 06_
(Date forms issued)

_J. Schnatterer_
(Signature of Party or their Representative)

_J. SCHNATTERER_
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action